1    .

2

3

4

5

6

7

8             **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

11 SHERYL D. MALDONADO,           No. EDCV 13-01062 SS

12           Plaintiff,

13      v.               **MEMORANDUM DECISION AND ORDER**

14 CAROLYN W. COLVIN,
Acting Commissioner of the
15 Social Security Administration,

16          Defendant.

17

18

19

20                    **I.**

21              **INTRODUCTION**

22

23      Plaintiff Sheryl D. Maldonado ("Plaintiff") seeks review of

24 the final decision of the Commissioner of the Social Security

25 Administration (the "Commissioner" or the "Agency") denying her

26 application for Disability Insurance Benefits and Supplemental

27 Security Income. The parties consented, pursuant to 28 U.S.C.

28 § 636(c), to the jurisdiction of the undersigned United States

Magistrate Judge.   For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed applications for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") on April 23, 2010. (Administrative Record ("AR") 137, 139).  In both applications, Plaintiff alleged a disability onset date of December 31, 2004.  (Id.).  The Agency denied Plaintiff's applications on August 16, 2010.  (AR 88).  On February 4, 2011, upon reconsideration, the Agency again denied Plaintiff's applications.  (AR 95, 100).  On April 6, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 106).  Plaintiff appeared and testified at a hearing held before ALJ Joseph Lisiecki on October 11, 2011.  (AR 45).  Ronald Hatakeyama, a vocational expert, and Craig Rath, a medical expert, testified at the hearing.  (AR 46, 49, 63).  On November 22, 2011, the ALJ issued a decision denying Plaintiff DIB and SSI.  (AR 9).

Plaintiff requested review of the ALJ's decision, which the Appeals Council denied on May 6, 2013.  (AR 1-4).  Plaintiff filed this action on June 21, 2013.

\\

\\

\\

1                                    III.

2                          FACTUAL BACKGROUND

3

4        Plaintiff was born on June 29, 1956.  (AR 20).  Plaintiff

5   was forty-eight years old at the time of her alleged disability

6   onset date.  (Id.).  She has an eleventh-grade education and

7   speaks, writes, reads and understands English.  (AR 161, 163).

8   Plaintiff previously worked as a sandwich maker and a cashier.

9   (AR 164, 210).  Plaintiff alleges that she suffers from

10  depression, panic disorder, anxiety, agoraphobia and social

11  anxiety.  (AR 162).

12

13  A.   Medical Records Of Treating Physicians

14

15       Plaintiff received treatment from a psychiatrist at the

16  Department of Mental Health ("Riverside") in Riverside,

17  California, beginning June 15, 2004.[1]  (AR 251-343, 360-384).

18  During her initial assessment, the doctor noted that Plaintiff

19  suffered from symptoms of depression and anxiety.[2]  (AR 330).

20  Plaintiff asserted that she suffered abuse in her marriage, but

21  acknowledged that she had been divorced for nine years prior to

22  the date she sought treatment at Riverside.  (AR 308, 330).

23  Plaintiff was unemployed for a year, but had previously worked as

24  _____

[1] Plaintiff received treatment in this facility with different

25  doctors, including Dr. A. Dia.  Some of the doctors' names,
    however, are unidentifiable due to illegible signatures.

26
    [2] Plaintiff divorced her husband approximately nine years before

27  beginning treatment at Riverside.  (AR 308).  Plaintiff began
    taking various medications, including Prozac and Xanax, a year

28  before the divorce.  (Id.).

                                     3

a cashier. (AR 308) Plaintiff lacked motivation, displayed poor energy and felt worthless. (Id.). Additionally, the doctor diagnosed Plaintiff with "amphetamine abuse," noting that Plaintiff "abus[ed] speed once a [month], as well as Xanax which she [stole] from [her] daughter." (AR 307). At her August 9, 2004 appointment, she informed the doctor that she was "applying for SSI." (AR 308).

Plaintiff did not show for her next appointment on June 22, 2004. (AR 308). Between June 22, 2004 and October 14, 2008, Plaintiff missed approximately eleven appointments. (AR 273, 277, 283, 298, 300-301, 303-304, 308). Plaintiff failed to show for appointments on June 22, 2004; October 19, 2004; April 29, 2005; June 16, 2005; October 24, 2005; February 11, 2008; July 23, 2008 and October 14, 2008. (AR 273, 277, 283, 298, 300-301, 303, 308). Additionally, Plaintiff cancelled appointments on October 5, 2004; October 20, 2004 and January 7, 2005. (AR 303-304).

On September 21, 2004, Plaintiff complained about her medication, Zoloft, but reported no side effects.[3] (AR 305). Furthermore, although her mood initially improved, she remained depressed. (Id.). Plaintiff claimed that she was "sleeping

---

[3] According to Plaintiff, she took Zoloft to treat her anxiety and depression. (AR 226). Zoloft is approved by the FDA to treat depression, obsessive compulsive disorder, panic disorder, post-traumatic stress disorder and pediatric obsessive compulsive disorder. Motus v. Pfizer Inc., F. Supp. 2d 1085, 1089 (C.D. Cal. 2000).

better" and panic attacks were "getting better" with an average of one per week.[4]  (Id.).

On September 22, 2004, Plaintiff received individual therapy.  (AR 304-05).  During that session, Plaintiff explained that she started having panic attacks "about three years ago," which affected her job as a cashier.  (Id.).  Plaintiff developed agoraphobia and "didn't like leaving her residence."  (AR 304). The doctor noted that Plaintiff "may still be using speed on a monthly basis and taking Xanax from her daughter."  (Id.).

Plaintiff missed her next four appointments, delaying her next meeting until February 17, 2005.  (AR 302-304).  Despite reporting "anxiety and feeling on verge of panic," Plaintiff's depression was "not bad" and she ate and slept well.  (AR 302). On March 31, 2005, Plaintiff felt "pretty good."  (AR 301). Plaintiff had "occasional" anger outbursts and panic attacks approximately once a week.  (Id.).  Plaintiff missed appointments in April and June.  (AR 300-301).

On July 29, 2005, the doctor noted that Plaintiff had not visited for four months.  (AR 300).  Plaintiff experienced increased anxiety after running out of medication "about three weeks ago," but felt no further panic attacks and remained sober. (Id.).  Plaintiff "support[ed] [her]self on alimony."  (Id.).

---

[4]  Previously, on August 9, 2004, Plaintiff complained of suffering panic attacks approximately three times a week.  (AR 308).

1  Similarly, on September 12, 2005, Plaintiff reported experiencing
2  "occasional" anger and anxiety, but no panic attacks.  (AR 299).
3  Plaintiff continued to "eat[] and sleep[] well."  (Id.).

4

5      On March 13, 2006, after a six month break in treatment,
6  Plaintiff reported feeling anxious and depressed after her
7  brother's death due to an accidental drug overdose.  (AR 298).
8  On June 5, 2006, however, Plaintiff stated "'I'm actually doing
9  well'" and voiced "no complaints."  (AR 297).  Plaintiff ate and
10  slept well, and kept active doing yard work and taking walks.
11  (Id.).

12

13      Plaintiff continued to report improvement between June 5,
14  2006 and March 5, 2008.  (AR 282, 288, 291, 293, 296-297).
15  Specifically, on September 8, 2006, Plaintiff stated she felt "a
16  lot better...more energetic and motivated."  (AR 296).  Plaintiff
17  did not look for a job, however, and supported herself on $500.00
18  monthly alimony.  (Id.).  Similarly, on November 30, 2006
19  Plaintiff experienced "occasional" anxiety but was "doing
20  reasonably well...and keeping active."  (AR 295).

21

22      Plaintiff further "voiced no complaints" and reported doing
23  well, keeping active and eating and sleeping well on February 22,
24  2007, May 22, 2007 and August 27, 2007.  (AR 291, 293-294).
25  Plaintiff "was upset [ . . . ] ex husband trying to cut off
26  alimony and court wants her to work."  (AR 294).  On November 19,
27  2007, Plaintiff felt stressed because her landlord refused to
28  renew her lease, but otherwise she was "doing pretty good" and

6

still looking for a job.  (AR 288).  On March 5, 2008, Plaintiff
was "doing well," and still living in her house since her
landlord extended her lease.  (AR 282).

     On May 28, 2008, Plaintiff stated that she started feeling
"self-conscious, anxious and sad for no clear reason."  (AR 280).
Plaintiff failed to show for her next appointment on July 23,
2008, however, and on August 18, 2008 stated, "I am feeling much
better."  (AR 275, 277).   On August 20, 2008, Plaintiff
complained of severe anxiety attacks, but reported no such
episodes two days earlier.  (AR 274).

     Plaintiff did not attend her next appointment on October 14,
2008.   (AR 273).  On October 21, 2008, she "re-started
experiencing panic attacks after about [four years] of panic free
period."  (AR 272).

     Between November 18, 2008 and May 17, 2010 Plaintiff
continued to improve.  (AR 256, 269, 270).  Specifically, on
November 18, 2008 Plaintiff felt "better, much less anxious, and
[had zero] panic attacks."  (AR 270).   On January 13, 2009,
Plaintiff stated, "'everything is good,' no further panic [and
occasional] anxiety."  (AR 269).  On March 17, 2009, Plaintiff
had just returned from a trip to Texas and reported "doing ok."
(AR 266).  Plaintiff similarly stated she was "doing well" and
exhibited a neutral mood, normal thought process and no side
effects from medication on April 30, 2009, February 22, 2010 and
May 17, 2010.  (AR 256-258).

1    On March 10, 2011, Plaintiff's "depression [was] ok but
2  fatigue and low motivation persist[ed]." (AR 366). On March 28,
3  2011, Plaintiff asked a nurse for additional medications because
4  she "got hysterical" after receiving a three-day notice to move
5  out of her house. (AR 365). Plaintiff reported that she took
6  extra Xanax "when [she] needed to" but could not remember how
7  many extra. (Id.).

8

9    A Narrative Report dated May 12, 2011 indicated that
10 Plaintiff visited Riverside County Mental Health from June 15,
11 2004 to March 10, 2011. (AR 384). According to the Narrative
12 Report, Plaintiff suffered from recurrent major depression, panic
13 disorder and agoraphobia. (Id.). Plaintiff had evidence of
14 insomnia, phobias, depression, anxiety and panic episodes.
15 (Id.). Plaintiff's prognosis was chronic and guarded. (Id.).
16 According to this report, Plaintiff could not maintain a
17 sustained level of concentration, engage in repetitive tasks for
18 an extended period or adapt to new and stressful situations.
19 (Id.). Plaintiff was not capable of completing a forty hour work
20 week without decompensating. (Id.). Plaintiff could, however,
21 manage her own funds. (Id.). Additionally, Plaintiff screened
22 positive for attention deficit hyperactivity disorder (ADHD),
23 which she had not yet been treated for. (Id.). The Doctor
24 hypothesized that "treatment of ADHD may help [with] her
25 depression and anxiety." (Id.). The Report did not comment on
26 Plaintiff's use of "speed" or Xanax from her daughter.
27 \\
28 \\

1    **B.    Non-Examining Doctor's Opinion Regarding Plaintiff's Mental**
2         **Condition**

3

4         On August 3, 2010, Dr. S. Khan completed a Physical Residual
5    Functional Capacity Assessment of Plaintiff ("RFC") based on a
6    review of Plaintiff's medical records.   (AR 347-59).   Dr. Khan
7    indicated that Plaintiff had mild restrictions for activities of
8    daily living and mild difficulties in maintaining concentration,
9    persistence or pace.   (AR 355).   Dr. Khan also found that
10   Plaintiff had no difficulties maintaining social functioning and
11   no repeated episodes of decompensation.   (Id.).   Dr. Khan stated,
12   "[Plaintiff] from a psychiatric standpoint appear[ed] to have
13   non-severe psych MDI and additionally it appear[ed] that the
14   psychiatric symptoms do not significantly decrease/impact
15   [Plaintiff]'s ability to function."   (AR 357).   Dr. Khan
16   concluded that Plaintiff had "mostly mild limitations."
17   (AR 359).

18

19   **C.    Medical Expert Testimony**

20

21        On October 11, 2011, medical expert Dr. Craig Rath testified
22   at Plaintiff's hearing.   (AR 45, 49).   Dr. Rath stated that
23   Plaintiff suffered from a mood disorder not otherwise specified
24   and an anxiety disorder not otherwise specified.   (AR 50).   Dr.
25   Rath considered Plaintiff for a panic disorder but she did not
26   meet the frequency criteria for a 12.063.[5]   (AR 50).   According

27   _____

28   [5]    According to the Disability Evaluation under Social
     Security, a 12.063 is defined as recurrent severe panic attacks

9

to Dr. Rath, the record reflected ratings of normal or mild for anxiety, panic attacks and depression. (AR 50-51). Plaintiff reported she was doing well on a number of occasions. (AR 51). Plaintiff's "main limitation would be stressed[sic] from all sources." (AR 52). Because Plaintiff is prone to anxiety, she had to be in no more than "a moderately stressful environment from all sources including no stressful high production quotas, no intrusive supervision." (Id.). Plaintiff "can't really be part of a team where there is a lot of peer pressure for her to perform." (Id.). Plaintiff also cannot be "in charge of the safety operation of others, no heights, [or] dangerous moving appointment." (Id.).

## D.   <u>Vocational Expert Testimony</u>

Vocational Expert ("VE") Ronald Hatakeyama testified about the existence of jobs in the national economy that Plaintiff could perform given her physical limitations. (AR 45, 63-65). According to the VE, a hypothetical individual of Plaintiff's vocational profile and RFC would not be able to perform Plaintiff's past work as a cashier or sandwich maker because she would have to deal with the public constantly. (AR 64). Plaintiff could perform other jobs existing in the national economy, however, such as an addresser in a mailroom or a linen room attendant. (AR 64-65). These jobs existed in significant

---

manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week.

numbers in the national and local economy.[6] (Id.) A hypothetical individual sharing Plaintiff's limitations could not perform any job in the national economy, however, if that person "could not persist throughout a normal eight hour workday or [forty] hour work week." (AR 66).

**E.   Plaintiff's Daughter's Third Party Function Report**

On July 11, 2010, Plaintiff's daughter, Aubree Maldonado ("Aubree"), completed a Third Party Function Report ("TPF Report") regarding how Plaintiff's alleged disability limited her activities. (AR 186). According to Aubree, Plaintiff's daily activities included watching TV, gardening, playing with her dog and cleaning. (Id.). Plaintiff also washed dishes, did laundry and worked in the yard. (AR 188). Plaintiff could prepare her own meals, but she no longer prepared four course meals. (Id.). Plaintiff did not socialize, work, drive or go shopping anymore. (AR 187, 189). "The only person (outside of [their] house) that she talks to is her sister." (AR 193). Plaintiff had "terrible insomnia almost every night." (AR 187). Plaintiff used to pay the bills herself, (AR 190), but "hasn't paid bills or had a bank account for years." (AR 189). Plaintiff's "attention span is nearly zero." (AR 191). Plaintiff also hid in her room whenever the landlord visited their house. (AR 192). Further, Plaintiff felt anxious and cried whenever something changed or was out of

---

[6]   According to the VE, 3,000 regional and 68,000 national mailroom addresser jobs existed, and 2,500 regional and 350,000 national linen room attendant jobs existed. (AR 65).

place.   (Id.).   "[E]ven the smallest change of any kind causes extreme panic, anxiety, [and] sometimes anger [and] tears."   (AR 193).

**F.   Plaintiff's Function Report**

On July 10, 2010, Plaintiff completed a Function Report. (AR 198, 205).   Plaintiff stated that her typical daily activities included drinking coffee, showering, eating, watching TV, feeding her dog, doing some housework, laying down, watering flowers and sometimes working in the yard.   (AR 198).   Plaintiff could no longer work, shop, socialize or cook complete meals because of her illness.   (AR 199-200).   Plaintiff could, however, prepare "sandwiches, frozen dinners [and] sometimes scrambled eggs."   (AR 200).   Plaintiff also regularly washed the dishes, did laundry, swept, watered flowers and pulled weeds.   (Id.). Plaintiff reported difficulty falling asleep, which she tried to remedy with Xanax.[7]   (AR 199).

Plaintiff claimed that she was unable to drive and could not leave her home alone because she was scared of having a panic attack.   (AR 201).   She did not shop at all, but sometimes went to the store with her sister or to the lake with her mom. (AR 201-202).   Plaintiff "[had] a hard time talking to people."

---

[7]   According to Plaintiff, she takes Xanax to treat her anxiety and panic attacks.   (AR 226).   Xanax is traditionally used to treat anxiety disorders.   Burger v. Astrue, 536 F. Supp. 2d 1182, 1189 n.8 (C.D. Cal. 2008) (citing The PDR Family Guide to Prescription Drugs 742 (9th ed. 2000)).

(AR 203).  She "[felt] stupid and [she felt] like no one [was] interested in what [she had] to say."  (Id.).  Plaintiff had a hard time reading.  (Id.).  She could follow written instructions "ok I guess," but she was not sure because she had not "tried to do anything like that for a long time."  (Id.).  Plaintiff got "really anxious if someone want[ed] to talk to [her] on the phone."  (AR 205).  Furthermore, Plaintiff took hours to complete paperwork like the Function Report because she "[got] panicky" and needed to stop and calm down after each question.  (Id.).  Plaintiff also needed things to be organized a certain way, including the space between objects on her dresser, because she was "afraid of thing[s] being different."  (Id.).

## G.  **Plaintiff's Testimony**

Plaintiff testified that "[she] got sick the first time when [she] was married."  (AR 56).  After leaving her husband, she started feeling better and "thought [she] was cured."  (AR 56-57).  She started having panic attacks again after working for six years.  (Id.).  Plaintiff could no longer "do [her] job or interact with customers."  (AR 57).  She became afraid to walk across the street, even though her job was only a five minute walk from her house.  (Id.).  Plaintiff stated, "I eventually got fired because my books were coming out all that, like money was missing and stuff and I guess they thought I was stealing." (Id.).

\\

\\

13

According to Plaintiff, "on good days" she showers, eats and sometimes works in the yard. (AR 55). She "rarely [goes] anywhere." (Id.). She attended a baby shower at her sister's house, however, because whenever she felt overwhelmed she could lock herself in her sister's room. (Id.). Plaintiff also sometimes goes to the market with her sister. (Id.). She gets "really anxious" and "overwhelmed with everything," however. (Id.). She watches TV and reads, but at times she cannot recall what she just read. (AR 55-56). When Plaintiff's mother visits, they walk the dogs around a lake. (AR 58). Plaintiff used to drive before getting sick, but no longer has a driver's license. (AR 59). Plaintiff's medication helped her stay out of bed and stopped her from wanting to commit suicide. (AR 61). Xanax also helps with her anxiety and panic attacks. (Id.). Plaintiff does not have any side effects from her medications except feeling "really tired" from Xanax. (Id.).

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and

14

incapable of performing any other substantial gainful employment that exists in the national economy.   Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.   20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)  Is the claimant capable of performing his past work?  If so, the claimant is found not disabled. If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

15

1  <u>Tackett</u>, 180 F.3d at 1098-99; <u>see also</u> <u>Bustamante v. Massanari</u>,

2  262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20

3  C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

4

5       The claimant has the burden of proof at steps one through

6  four, and the Commissioner has the burden of proof at step five.

7  <u>Bustamante</u>, 262 F.3d at 953-54. "Additionally, the ALJ has an

8  affirmative duty to assist the claimant in developing the record

9  at every step of the inquiry." (<u>Id.</u> at 954). If, at step four,

10  the claimant meets her burden of establishing an inability to

11  perform past work, the Commissioner must show that the claimant

12  can perform some other work that exists in "significant numbers"

13  in the national economy, taking into account the claimant's RFC,

14  age, education, and work experience.  <u>Tackett</u>, 180 F.3d at 1098,

15  1100; <u>Reddick</u>, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1),

16  416.920(g)(1).  The Commissioner may do so by the testimony of a

17  vocational expert or by reference to the Medical-Vocational

18  Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2

19  (commonly known as "the Grids").  <u>Osenbrock v. Apfel</u>, 240 F.3d

20  1157, 1162 (9th Cir. 2001).  When a claimant has both exertional

21  (strength-related) and non-exertional limitations, the Grids are

22  inapplicable and the ALJ must take the testimony of a vocational

23  expert.  <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000)

24  (citing <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1340 (9th Cir. 1988)).

25

26

27

28

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (AR 22).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity because her alleged disability onset date of December 31, 2004.  (AR 14).  At step two, the ALJ found that Plaintiff had the severe impairments of mood disorder and anxiety disorder that "cause significant limitation in [Plaintiff's] ability to perform basic work activities."  (AR 14-15).  The ALJ found, however, that all other alleged impairments were not severe under Social Security Administration regulations.  (AR 15).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 15).  The ALJ stated that Plaintiff had moderate difficulties in activities of daily living and social functioning, and with regard to concentration, persistence or pace, which do not satisfy the "'paragraph B'" criteria.  (AR 15-16).

Next, the ALJ found that Plaintiff had the residual functional capacity to perform work at all exertional levels, but with nonexertional limitations including: no more than a moderately stressful environment; no high production quotas or

intrusive supervision; no team type of work; should not be in charge of the safety of others; and should not be around heights or dangerous machinery. (AR 16-17).

The ALJ found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the above [RFC] assessment." (AR 19). The ALJ stated that Plaintiff's treatment "[had] been essentially routine and conservative in nature;" Plaintiff had not been hospitalized, did not receive regular, individual or group therapy, and her medications remained stable. (AR 18). Furthermore, despite evidence of continued treatment, Plaintiff's treatment had actually been "successful in controlling the symptoms" overall. (Id.). The ALJ also gave considerable weight to Dr. Rath's and Dr. Khan's opinions. (AR 19-20). According to the ALJ, their opinions were consistent with the determination that Plaintiff's conditions were not severe enough to "significantly decrease or impact" Plaintiff's ability to work. (AR 19).

The ALJ gave little weight to the TPF Report and the Riverside psychiatrist's opinions. (AR 20). The ALJ found inconsistencies between the Riverside psychiatrist's opinions and treatment notes throughout Plaintiff's treatment period.[8] (AR 20). Specifically, the psychiatrist noted that Plaintiff had

---

[8]  The ALJ did not identify the Riverside psychiatrist but referred instead to "a psychiatrist" generally. (AR 20).

impaired judgment, but "nearly all" of Plaintiff's treatment notes categorized her judgment as "within normal limits." (AR 20). Thus, the ALJ considered the psychiatrist's opinions, but believed the other evidence in the record did not support them. (Id.). The ALJ also considered the Plaintiff's daughter's discussion of Plaintiff's daily activities in the TPF report. (Id.). The ALJ noted that this did corroborate Plaintiff's testimony, however, because Plaintiff's daughter was "not a medical source and did not observe [Plaintiff] in a professional capacity" the ALJ found the statements to be "of little value." (Id.).

The ALJ noted that Plaintiff's "self-reported activities of daily living [were] inconsistent with her allegations of disability." (AR 18). Furthermore, the ALJ questioned whether Plaintiff's "continuing unemployment [was] actually due to medical impairments" because Plaintiff worked "only sporadically" prior to the alleged disability onset date. (Id.). The ALJ noted evidence that Plaintiff "was not working for reasons unrelated to the allegedly disabling impairments," including her alimony payments and lack of transportation. (AR 19).

At step four, the ALJ determined that Plaintiff could not perform her past relevant work as a sandwich maker and cashier. (AR 20). At step five, the ALJ considered Plaintiff's age, education, work experience, and RFC. (AR 20-21). Because Plaintiff's past relevant work was unskilled, the transferability of job skills was "not an issue." (Id.).

1

2       Based on the VE's testimony, the ALJ found that, considering

3  Plaintiff's age, education, work experience and RFC, there were

4  jobs existing in significant numbers in the national economy that

5  Plaintiff could perform.   (AR 21).   The ALJ concluded that

6  Plaintiff could perform work at all exertional levels but with

7  some nonexertional limitations.   (Id.).   Potential available jobs

8  included an addresser in a mail room and a linen room attendant.

9  (Id.).   The ALJ further determined that such jobs existed in

10  significant numbers in both the local and national economy.

11  (Id.).

12

13                              **VI.**

14                        **STANDARD OF REVIEW**

15

16       Under 42 U.S.C. § 405(g), a district court may review the

17  Commissioner's decision to deny benefits.   The court may set

18  aside the Commissioner's decision when the ALJ's findings are

19  based on legal error or are not supported by substantial evidence

20  in the record as a whole.   Aukland v. Massanari, 257 F.3d 1033,

21  1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen

22  v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v.

23  Bowen, 885 F.2d 597, 601 (9th Cir. 1989)); See also Simon v.

24  Colvin, 749 F.3d 1106, 1106 (9th Cir. 2014) (citing Smolen 80

25  F.3d 1273, 1279).

26

27       "Substantial evidence is more than a scintilla, but less

28  than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson

20

1   v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant

2   evidence which a reasonable person might accept as adequate to

3   support a conclusion." (Id.) (citing Jamerson, 112 F.3d at 1066;

4   Smolen, 80 F.3d at 1279).   To determine whether substantial

5   evidence supports a finding, the court must "'consider the record

6   as a whole, weighing both evidence that supports and evidence

7   that detracts from the [Commissioner's] conclusion.'"  Aukland,

8   257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th

9   Cir. 1993)).   If the evidence can reasonably support either

10  affirming or reversing that conclusion, the court may not

11  substitute its judgment for that of the Commissioner.  Reddick,

12  157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457

13  (9th Cir. 1995)).

14

15                              **VII.**

16                          **DISCUSSION**

17

18      Plaintiff contends that the ALJ erred by improperly finding

19  Plaintiff's testimony less than credible. (Memorandum in Support

20  of Plaintiff's Complaint ("MSPC") at 2-7).  The Court disagrees.

21  For the reasons discussed below, the ALJ's decision is AFFIRMED.

22  \\

23  \\

24  \\

25  \\

26  \\

27  \\

28

                              21

**A.    The ALJ Provided Clear And Convincing Reasons For Rejecting Plaintiff's Subjective Testimony**

**1.    Legal Standard**

When assessing a claimant's credibility, the ALJ must engage in a two-step analysis. <u>Molina v. Astrue</u>, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing <u>Vazquez v. Astrue</u>, 572 F.3d 586, 591 (9th Cir. 2009)). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. (<u>Id.</u>). Then, If there is, in order to reject the testimony, the ALJ must make specific credibility findings. (<u>Id.</u>). The ALJ may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence. <u>Burch v. Barnhart</u>, 400 F.3d 676, 680 (9th Cir. 2005); <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 346-47 (9th Cir. 1991).

In assessing the claimant's testimony, the ALJ may consider many factors, including:

(1)    ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid;

(2)    unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and

22

1    (3)  the claimant's daily activities.

2

3    Smolen, 80 F.3d at 1284.  Additionally, the ALJ may discredit the

4    claimant's testimony where his normal activities can transfer to

5    the work setting.  Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d

6    595, 600 (9th Cir. 1999); See also Vertigan v. Halter, 260 F.3d

7    1044, 1049 (9th Cir. 2001).

8

9        Here, the ALJ provided sufficient reasons for rejecting

10   Plaintiff's testimony.  The ALJ stated four specific explanations

11   for finding Plaintiff's subjective testimony less than fully

12   credible: (1) Plaintiff's testimony contradicted the medical

13   evidence; (2) Plaintiff's symptoms improved through medication;

14   (3) Plaintiff's daily activities demonstrated an ability to work;

15   and (4) Plaintiff had possible alternative reasons for not

16   working.

17

18       2.   **Medical Evidence**

19

20       First, the ALJ considered the fact that Plaintiff's

21   "treatment [had] been essentially routine and conservative in

22   nature." (AR 18).  The ALJ noted that, although Plaintiff had

23   mental impairments that caused difficulty, "[she] ha[d] not been

24   hospitalized, ha[d] not engaged in regular individual or group

25   therapy, and her medications ha[d] been fairly stable." (Id.).

26   The Court agrees that the conservative nature of Plaintiff's

27   treatment undermines Plaintiff's testimony.  See Johnson v.

28   Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (stating that

                                    23

conservative or infrequent treatment may be used by the ALJ to discredit Plaintiff's subjective pain testimony); Tomasetti v. Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008) (stating that conservative treatment may undermine a claimant's reports regarding severity of an impairment).

Furthermore, the ALJ found that the medical evidence does not support Plaintiff's subjective testimony. (AR 18-19). For example, Plaintiff claimed that she suffered disabling panic attacks, but the medical records routinely show that while she may have experienced panic attacks, she would often report that she "[was] doing well." (AR 18). Further, Plaintiff reported that Xanax "effectively controll[ed] her panic attacks." (Id.). As such, the ALJ properly gave substantial weight to the opinions of Dr. Rath and Dr. Khan, and rejecting Plaintiff's testimony on her subjective symptoms. (AR 19). See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2005) (holding that "[w]hile subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects").

In assessing credibility, the ALJ may examine testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which Plaintiff complains. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). Dr. Rath found that Plaintiff had a mood and anxiety disorder "not otherwise specified," but Plaintiff's ratings were essentially "normal or

24

1    mild throughout the entire record." (AR 19). Dr. Khan similarly

2    found that Plaintiff's limitations "[were] not severe and [did]

3    not significantly decrease or impact" her ability to work. (AR

4    19). The ALJ gave more weight to these opinions because, even

5    though Dr. Khan and Dr. Rath were non-examining doctors, they had

6    greater expertise in the Social Security Act and regulations,

7    including "all pertinent definitions and procedures utilized by

8    the Social Security Administration in determining whether an

9    individual is entitled to disability insurance benefits under

10   Title II and supplemental security income under Title XVI."

11   (Id.). Therefore, the ALJ properly considered the medical

12   evidence in discrediting Plaintiff's subjective pain testimony

13

14        **3.   Successful Control Of Symptoms Through Medication**

15

16        Second, the ALJ stated that Plaintiff's treatment had been

17   "generally successful" in controlling the disabling symptoms.

18   (AR 18). Plaintiff's medical records "reflect that she routinely

19   report[ed] that she [was] 'doing well.'" (AR 18).

20   Specifically, Plaintiff "felt better" on October 5, 2004 (AR

21   304); felt "pretty good" on March 31, 2005 (AR 301); felt "no

22   panic" on September 12, 2005 (AR 299); was "doing well [...] and

23   voic[ed] no complaints" on June 5, 2006 and August 27, 2007 (AR

24   291, 297); felt "a lot better" with more energy and motivation on

25   September 8, 2006 (AR 296); felt "much better" on August 18, 2008

26   (AR 275); felt "better, much less anxious, and [zero] panic

27   attacks" on November 18, 2008 (AR 270) and was "doing well"

28

November 30, 2009, February 22, 2010 and May 17, 2010 (AR 256-258).

The ALJ also noted that "the side effects from her medications are either nonexistent or mild." (AR 18). From September 2004 through May 2010, Plaintiff regularly reported no side effects from her medication. (AR 256-259, 266, 269, 270, 272, 275, 280, 282, 288, 291, 293-297, 299, 301, 305). As a result, the successful treatment of Plaintiff's condition through medication undermined the assertion that her disability would not allow her to work. See Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (stating that "effectiveness or adverse side effects of any pain medication" may be used by the ALJ in making a credibility determination); Tommasetti, 533 F.3d at 1040 (stating a favorable response to conservative treatment, including medication, may undermine a claimant's assertions).

### 4. Daily Activities

Third, in rejecting Plaintiff's subjective pain testimony, the ALJ noted that Plaintiff's "self-reported activities of daily living are inconsistent with her allegations of disability." (AR 18). Plaintiff's Riverside medical records indicate that she reported "keep[ing] active, do[ing] yard work, read[ing], and go[ing] to[sic] walks" on June 5, 2006 (AR 297); dieting, keeping active, and losing weight on September 8, 2006 and November 30, 2006 (AR 295-296); going for long walks and "looking for jobs" on August 27, 2007 (AR 291); keeping active on March 5, 2008 (AR

26

1  282); travelling to Texas on March 17, 2009 (AR 266) and taking

2  care of her mother, who potentially had Alzheimer's, on February

3  22, 2010 (AR 257).  Plaintiff also reported on her July 10, 2010

4  Function Report that she did housework and yard work, took care

5  of her dog, prepared meals and sometimes went to the store with

6  her sister.  (AR 198-202).  Further, at the hearing before the

7  ALJ on October 11, 2011, Plaintiff testified that she did yard

8  work, occasionally went to the market with her sister and walked

9  dogs when her mother visited.  (AR 55-56, 58).

10

11      The ALJ appropriately considered Plaintiff's daily

12  activities when making his credibility determination.  See, e.g.,

13  Morgan, 169 F.3d at 600 (the ALJ may discredit the claimant's

14  testimony where his normal activities can transfer to the work

15  setting); Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996)

16  (to determine whether the plaintiff's testimony regarding the

17  severity of his symptoms is credible, the ALJ may consider the

18  claimant's daily activities); Fair v. Bowen, 885 F.2d 597, 603

19  (9th Cir. 1989) (if the plaintiff can perform household chores

20  and daily activities that involve "similar physical tasks as a

21  particular type of job," and ALJ could conclude that the alleged

22  disability "does not prevent the [plaintiff] from working.")

23  Consequently, the Court finds that remand is not required.

24

25

26

27

28

1          **5.   Other Possible Explanations**

2

3          Finally, the ALJ noted that Plaintiff's continued
4    unemployment could be due to reasons unrelated to her medical
5    impairments. (AR 18-19). On June 29, 2005, Plaintiff reported
6    that she supported herself on alimony. (AR 300). On September
7    8, 2006, Plaintiff reported that she was not looking for a job
8    and continued to support herself on alimony. (AR 296). On
9    November 30, 2006, Plaintiff considered working but asserted that
10   she lacked transportation. (AR 295). On May 22, 2007, Plaintiff
11   was looking for a job "per court request," however, she still
12   received alimony. (AR 293). Furthermore, Plaintiff reported
13   that she continued looking for jobs on August 27, 2007 and
14   November 19, 2007. (AR 288, 291). Thus, considering evidence
15   that Plaintiff looked for work and claimed other reasons for not
16   working, the ALJ properly concluded that Plaintiff's unemployment
17   may be unrelated to her medical conditions. See Bruton v.
18   Massanari, 268 F.3d 824, 828 (9th Cir. 2001) (the ALJ properly
19   considered other possible explanations for lack of work unrelated
20   to plaintiff's medical condition).

21

22

23

24

25

26

27

28

1    In  sum,  the  ALJ  offered  clear  and  convincing  reasons

2 supported  by  substantial  evidence  for  finding  Plaintiff's

3 subjective  testimony  less  than  fully  credible.

4

5                              **VIII.**

6                           **CONCLUSION**

7

8    Consistent  with  the  foregoing,  IT  IS  ORDERED  that  Judgment

9 be  entered  AFFIRMING  the  decision  of  the  Commissioner.  The  Clerk

10 of  the  Court  shall  serve  copies  of  this  Order  and  the  Judgment  on

11 counsel  for  both  parties.

12

13 DATED:  September 26, 2014            _____/S/_____

14                                      SUZANNE H. SEGAL
                                        UNITED STATES MAGISTRATE JUDGE
15

16

17

18 **THIS  DECISION  IS  NOT  INTENDED  FOR  PUBLICATION  IN  LEXIS,  WESTLAW**

19 **OR  OTHER  LEGAL  DATABASE.**

20

21

22

23

24

25

26

27

28